The next case is 5-23-0527, in Ray the Marriage of Lewis, representing the appellant is Mr. Grinegar. Did I pronounce that correctly? Yes. And representing the appellee is Ms. Johnston. Yes. Thank you. Mr. Grinegar, are you ready to proceed? Yes, Your Honor. All right. You may do so. Thank you. Daniel J. Grinegar for the appellant, Don Lewis. May it please the Court. Opposing counsel? The parties were divorced in August of 1996. At that time, the husband had been in the Air Force as a captain for only five years. There is a single provision in the judgment of disillusion, which is very simplistic, which defines the division of the military retiree retainer pay. And it goes like this. It's on page, in paragraph 3 of the judgment of disillusion. And it says that based on the length of marriage of 10 years, petitioner is entitled to a portion of respondent's pension equal to the number of years married while respondent was in the military, five years, divided by the number of years of retirement times 50 percent. That is the sole provision that discusses the division of the pension, as they call it. And the only word in there that defines a dollar amount is pension. The rest of it is all geared toward coming up with the percentage to be applied to whatever a pension is. So hearing was held on a petition to show cause. That's how this came to light. He retired in September of 2019. And hearing was held on a petition to show cause when the husband failed to provide documents with respect to disclosing what his military retiree retainer pay was through his military retiree account statements. At that hearing, the trial judge in the case addressed the issue of not only to show cause, but also addressed the issue of what is the dollar amount that the wife is entitled to with respect to military pension. Let me stop you there, counsel. And that was back in February of 21. Is that correct? Yes, Your Honor. All right. So in light of that, how does this court have jurisdiction over that matter? So that was one issue that was pending among several at that point in time. In February of 2021, it was not just the petition for rule to show cause, but in order to calculate what the share of the military pension was and also to address survivor benefit plan issues that were pending. So all of those were on the table. All of that was taken by the court with respect to a subsequent hearing after February of 2021. The trial court then at two later hearings discussed the issues with respect to not only division, not only award of the survivor benefit plan, which I'll get to in just a minute, but also with respect to a calculation of what that exact dollar amount was. And it was at the testimony, however, at the first hearing, that the trial judge made some statements with respect to what that meant with respect to the word pension. So the husband started to testify at the first hearing on petition. But again, the court entered an order and issued a ruling on that matter. Is that correct? The court only entered an order with respect to show cause. And then the court came back and said, I'm going to say that the dollar amount that you owe is some, it was a calculation based on $706 a month is what the court initially addressed in that ruling. But the court did not enter an order with respect to survivor benefit plan. So there was still pending issues in the case. And it was at that hearing in February of 2021 that the court made some statements regarding the, how it came to the dollar amount that it came to in saying, you owe this as back amounts back to the date of your retirement in September of 2019. Didn't the judge say that it was crystal clear? The calculation was crystal clear? Yes, and therein lies the problem. So that's what I wanted to address in the first issue with respect to the military pension. The husband started to testify that he took the high three formula, which was used by the military, the Air Force, actually it was Department of the DFAS, Defense Finance and Accounting Service. And he took the high three, which was the last three years of his pay, and he said this is what she's entitled to using those three years of pay preceding the divorce as a captain with five years of military service. And with regard to that, he's talking about the 36 months that precede the actual retirement. That's the formula that DFAS uses to calculate what the service member's retired pay is going to be so that they don't get promoted to a colonel one day and retire as a colonel receiving that pay the next day. But, counsel, didn't the trial court state that they didn't have jurisdiction to modify the underlying judgment? Can you point to any case law that suggests that this high three formula would be allowed? Well, the high three formula is what DFAS uses per the federal statute. All right. But where is the case law that suggests that the trial court had jurisdiction to modify the underlying judgment? Well, and that's what I'm saying, is that the court was not, would not have needed to modify the underlying judgment because the only word that was in the judgment was the word pension. It didn't say military retired or retainer pay. It didn't say net pay. It didn't say gross pay. It didn't include the issue of taxation associated with that. It didn't include the longevity pay increases that the husband received after the divorce. But again, counsel, aren't those issues waived if they are not addressed in the underlying judgment of dissolution from 1996? Where does the trial court have jurisdiction to modify those things? Well, the question becomes what the word pension means. If pension is supposed to be something to define a dollar amount, it needs to state what that is. And this judgment of dissolution said nothing on the issue of what the dollar amount was. And that's where the problem lies. The judge was half right when he says this, what I've heard so far is that the formula was not used. Instead, the high three was used. What I have is a formula that's set forth in the MSA, which is crystal clear on its face as to how that, the retirement is to be calculated. He's half right. It's crystal clear with respect to the percentage. But the other half is completely missing. What is that percentage to be applied to? What is the dollar amount that constitutes pension? And therein lies the problem. When the husband started to testify with respect to that, the judge cut him off. The judge said, I'm going to jump in here. And that's when he started to say about the formula that I just recited. The formula was set forth in the marital settlement agreement as to how that retirement is calculated. The problem is he made the mistake of assuming that it's either high three or the formula in the judgment of disillusion. And they're not mutually exclusive. They're complementary. You have both. The formula in the judgment of disillusion defines the percentage. The high three defines the methodology for calculating what pension means. And so that's wherein the judge made his mistake. If the high three is correct, then why would there be a reason to submit by February 1st of each year his information? Because if the wife had those numbers and it demonstrated what the husband was receiving as a colonel with 28 years of service, which was his final retired pay, she could then calculate what the cost of living adjustments were each year after that. Because you can use those numbers to compare to the previous military retirement account statements and say this is the percent that the wife is entitled to based on the total amount received by the husband that he received over and above what he got last year. COLAs, there's two types of COLAs. One is pre-retirement. The other is post-retirement. The pre-retirement COLAs, cost of living adjustments, granted to military service members, is granted by Congress. It has nothing to do with inflation, for example. The other one, the post-retirement ones, are based on the consumer price index for the third quarter of the previous year. And so it's tied to the economy. But the short of it is, to answer your question, she could compare 2019, what he was receiving with his military retired pay, to 2020 and say, okay, that's the COLA that I'm entitled to my share of. And she makes a statement at some point in time, I was getting 50% at the time of the divorce in 1996. Now I'm only getting 9%. I've lost a lot of money. The answer is she's actually getting more. It's better to have 9% of a much greater amount than it is 50% of a smaller amount that existed back at the time of the divorce. And isn't that contemplated in the original judgment of dissolution? The original judgment says his term of service. I mean, isn't it contemplated that she was going to get a percentage based on his entire length of service? So that would assume, then, that there would be bonuses and promotions. No, I don't think that anyone would assume that he would stay stagnant in the position for an additional 15 years. However, if he did, didn't she bear that risk as well? She didn't bear the risk that he wouldn't – the only risk that she bore is that he wouldn't retire. Because it's only five years, you know, and he has to be in for 20 years in order to retire from the military. But that was the deal that they both bargained for, wasn't it? Absolutely. The judgment of dissolution is what they both bargained for. The question becomes interpretation of what that provision means. And it's limited to the word pension. And pension, as I said earlier, doesn't say anything about how you calculate that. So what he does, what the husband testifies to, is this is how DFAS would calculate it. They would take the high 36. He says three years. It's 36 months, actually. But it's the same thing. But he said they'd take the high three years. They would average that, and that would become her share based on a captain with five years. And the only mistake he made in his testimony was not applying the COLAs, the cost of living adjustments. And I'm talking about pre-retirement COLAs, not just post-retirement. What is our standard of review here, Jameson? So the standard of review for the court's initial calculation would be abuse of discretion. The trial judge heard evidence with respect to what the wife pitched, which was that that is that we should just use a gross amount without any consideration for taxes, without any consideration that he might be promoted, without any consideration for longevity. The husband argued, no, it should be based on the high three, which was a captain, five years, et cetera, et cetera. So the standard of review initially would have been abuse of discretion. However, then the judge goes on. In the motion to reconsider, the judge came down with an order. Actually, earlier than that, in the court's order entered March of 2023, the final judgment, he says in paragraph A, the parties agreed that petitioner's monthly share of response military retirement pension equals $753.75 a month, which is hereby reduced to an order of this court. Nowhere in any of the text, in any of the transcripts does it say that the parties agreed to $753. Nowhere, in fact, anywhere in any of the hearings did anyone even say anything about agreeing to a set dollar amount. In fact, the only issue that they stipulated to, because the judge found it to be a stipulation in the end, the only issue that they stipulated to was the percentage, which is crystal clear from the judgment of disillusion. Everybody agrees it's 9%. That's her share. The only question is 9% of what? Back to that again. And they could have agreed to a set dollar amount. They could have stipulated to that, but they didn't do that in this case. How could they have done it? They had the husband's military retirement account statements. That was disclosed. And they could have said on the record, this is what the dollar amount is that everybody agrees to. And nobody did that. And yet the judge found that they had stipulated to a dollar amount. And therein lies the second part of the problem. Now, that, whether a — whether statements on the record constitute a stipulation, I think the standard of review, Your Honor, is denotable, because the court can look at the facts and apply the law. The trial courts believe they stipulated to the amount based upon the formula, based upon the percentage. But they didn't stipulate to an amount anywhere. But that's how you get to the amount. You apply the formula. Well, I agree you apply the — the formula in the judgment of disillusion doesn't say anything about how to calculate the pension. All it says is this is the percent. But the only thing they stipulated to was, yes, it's 9 percent. And that's why I quoted so much of the text of the transcripts, because I wanted to cover everything that they talked about with respect to this stipulation. The problem is the stipulation nowhere during the course of that does anybody mention a dollar amount number. And therein lies the problem. So unless there's any questions, I'm going to jump to SVP just real quickly, because that also is an issue in this case. So for purposes of survivor benefit plan, the language in here says that the wife is responsible for petitioner and or her attorney will submit the proper form to the Department of Defense. This is the same paragraph. It's the end of that very same paragraph. Respondents shall cooperate and sign any and all forms if required. The testimony was that the wife never submitted anything. She never sent in what was called a deemed election letter. And this would have preserved her right to receive the survivor benefit plan. Whether it's for 25 percent, 100 percent, 75 percent, it wouldn't make any difference. She never sent in a deemed election letter to reserve her ability to get SVP. I want to stop you there. Wasn't there some testimony, though, that your client could have, in fact, notified the plan that upon his retirement and she could have been named as beneficiary at that point in time? The only testimony was that he could have put her name on the SVP beneficiary. It would have had no effect on her. But if it was current wife, not his former wife, pursuant to the Naval Settlement Agreement, is that correct? That's correct. He did do that. Okay. But herein lies the problem. The only person that could have preserved the right to her to get SVP, I see my time is up. The only person who could have preserved that right is the wife. There was no such thing as a 2656-10 back in 1996. She had to submit her deemed election letter within 365 days or she waived it. I used to do these cases all the time back in the 90s when I got out of the military. There was no magic document. It was a deemed election letter, and you submitted it to DFAS. It would sit in your file. When he retired, then the DFAS would pull it out and say, okay, you're required to name her as beneficiary. She never did that. The expert's testimony addresses this. A little confusing, but he does address this. He says it in the third deadline. Well, the third deadline only kicks in if she had properly preserved her deemed election letter in the first deadline in the first place. So, thank you, Ron. Ms. Johnston? I'm ready. May it please the Court, opposing counsel. I'm Fran Johnston for the appellee, Stacey Renegal. I do agree that the appellant has a standard of review, is an abuse of discretion. Actually, this Court, in remarriage of an admirer, used a hybrid, manifest weight of evidence or an abuse of discretion, quoting Illinois Supreme Court case Lobson. And I think the Court alluded to that earlier this morning when one of the justices said there's only two standards, de novo or the other two. And I believe that is the case. However, in a second district in remarriage of Nutter and a third district in remarriage of Tantawangsi, stipulations were not reversed unless it was an abuse of discretion by the trial court. So I don't think the standard for the stipulation is de novo. So that is one point I disagree with the appellant on. It's interesting to say that the 9% was not to be applied to a number. A person's pension is a number. I mean, in fact, when you receive your pension, that is an amount. And I also noticed that the appellant, he did read exactly the verbiage from the parties judging the dissolution in 1996. But what he didn't read was the verbiage from a stipulated order entered by the parties on June 22nd of 2005, nine years after the judgment was entered. It stated that the marital settlement agreement entered on August 23rd, 1996, is hereby clarified to provide that the respondent must notify the petitioner immediately upon his retirement. He must provide the petitioner a copy of his statement within 10 days. He must thereafter provide it with their retirement statement on an annual basis by February 1st of each year. Then within 14 days, he's to provide the petitioner with verification of the fact that she's named a survivor of his survivor benefit plan. So by the appellant's rationale that she was out of touch with the survivor benefit plan within that year, nine years later, nine years after the judgment is entered, he's to provide her verification that she's named as his beneficiary. So if that were in case, if that was something the appellant believed at the time, I would have thought he brought that to the court's attention. Counsel, one of the questions I asked the appellant here was about the jurisdictional issue. Can you for a moment address the issue of jurisdiction? I don't know if these orders are from subsequent years. Yes, Your Honor. He was actually found in contempt on February 22nd of 2021. The notion to reconsider was filed on April 11th, 2023. And I did briefly touch on that in our brief that that actual order, the February 22nd, 2021 order, actually stated that there was no just reason for delaying enforcement or appeal of this order. Illinois Supreme Court Rule 304 states that an appeal may be taken from a final judgment as to one or more, but fewer than all of the parties or claims, only if the trial court has made an express written finding that there's no just reason for delaying enforcement or appeal of this order. And it said, and I think it's Section 5, an order finding a person or entity in contempt of court, which opposes a monetary or other penalty. The only thing left open, I think, at that time, and I think the appellant alluded to, was that the court did not know he found him in contempt. He used the special language that 304 and 303 requires him to use. He did not know how to make a hole in the survivor benefit plan, because at that point in time, the court already knew that there was no way he could do that. He couldn't take it back. He did retire in September, on September 1st of 2019. My client was not, she kind of found out through, I guess, one of the party's daughters. They have two adult daughters. She found out through one of them that he had retired. She sent multiple letters. She hired two attorneys. She said, where's my retirement, my portion of your retirement? She received nothing until, I believe, June of 2020, he sent her a check. Not a retirement statement, just a check saying, this is your portion of the retirement. So by that time, or by that point in time, there was no way that my client could have went back to DFAS or done anything about naming her as the beneficiary of his survivor benefit plan. It was too late. The court knew it was too late. So you, back to my original point, sorry. You agree that the issue of the survivor benefits, that the court does have jurisdiction of that issue? You would agree with that statement? I would agree that they have jurisdiction of the issue of whether the court had, was able to require him to provide a life insurance policy equal. Because I think the court, at that point in time, they had already found him in contempt. 2021, that ship has sailed. He's in contempt. But I think by the time it came around to what he was going to do to allow him to purge contempt, because the Eleanor Supreme Court has said that a person must be given the keys to their cell. They must be allowed to purge that contempt. And I think that he actually offered both clients to submit proposals in that regard. And I don't know exactly where that is in the record, but it is in the record. Judge Foley offered both counsel, and I don't believe it was Mr. Groninger, but prior counsel of the appellants to issue statements as to what they believe that amount should be, what that amount of 25% of what his benefits would be. My client submitted her proposal of a certain amount. I believe it was the $250,000. And the appellant submitted zero, that she should get zero. And that was his offer to the court. Let me ask you this. I think I mentioned this regarding the retirement benefits. Is the order of the court requiring life insurance, is that a modification of the underlying marital settlement agreement? I don't believe it is a modification, because the Supreme Court has held, and there are several cases where if a person is not allowed, if there is an unavailability to purge that contempt, and I think this court actually quoted it, but it was in an unpublished opinion, but in Bank of America, N.A. v. Free, the first district, an unachievable purge provision is a nullity. So the court had to allow him to purge that contempt by doing something, and that was the only way they could think of to allow him to purge, to make her whole. And I guess the Illinois Supreme Court has thought about this a lot. In Smithburg v. Illinois Municipal Retirement Fund, the husband was to name his wife as his beneficiary on his Illinois Municipal Retirement Fund. He named his new wife as his beneficiary, and then they couldn't file a contempt proceeding because he was deceased. So they actually had to file a proceeding against the IMRF. And when they filed that proceeding against the IMRF, the Supreme Court said the court retained its equitable powers, and such power cannot be taken away or abridged by the legislature. They also said the circuit court would not allow it, but the appellate court overturned it, and then the Illinois Supreme Court said that the appellate court had done what ought to be done. And so I do think that he had the—I don't think he was modifying it. I think he was saying, you're in contempt for failure to name her as SVP. I know you can't name her as SVP now. And that was entirely his fault. His own expert, and I think you touched on this, Justice Shuler, that his own expert testified, Mark Sullivan testified, that he could have named her as the survivor benefit. He was questioned by not only the court, the trial court, but also by myself on the record on page 162 and 163, and he said, yes, he could have named his former spouse as the beneficiary. He failed to do that. Instead, in September, he named his current spouse and waited until June of 2020 for my client to find out, which at that point in time, it would have been unachievable. As to the stipulation, there's a lot of things on the record. In February 14th of 22, the trial court specifically asked if there were any stipulations on the record. This is on page 201 of the record. The response by Tishner's counsel stated the retirement, and the appellant's own counsel responded, the magic number for the percentage of retirement pay. Those were his words. I quote, the magic number for the percentage of retirement pay. So now there's a question about what this 9% applies to. Well, it's a different attorney now, and it's two years later. But at that point in time, the judge said, later in that same morning of February 14th of 22, the parties were sworn in, and the court asked, you are in agreement that 9% is the percentage to be used towards to apply towards Ms. Renegol's percentage of your retirement. Both parties answered yes. And then in April of 2023, all of a sudden, we don't know what the 9% is to be applied to. The court said it was crystal clear, and I think Justice Shuler even touched on that, that it was crystal clear what was written. It didn't say anything about high threes. It didn't say anything about taxes. It didn't say anything about all of the stuff that the appellant's bringing up in 2023. It was clear. That June 2005 clarifying stipulated order, I think Justice McHaney touched on this, that what would be the need? What would be the need to give her an annual statement in February of each year if that's not what the percentage was to be applied to? So he did stipulate in open court that that 9% was going to be the percentage. The court took that stipulation, and that's why he denied the motion to reconsider. He stated in the motion to reconsider that I'm not going to, I didn't hear any evidence on this. The parties agreed to it, and so I'm not going to reconsider that point. The appellant's attorney also in February, and I think this is in the record, page 385, his own attorney stated on the record, when my client produces a retirement statement, he's asking to be allowed to redact all of the other information except the pay. So the pay was what the parties were basing that 9% on. This court in Whiting disagreed when the husband argued that the wife shouldn't be allowed his COLA adjustments on his military pension because she should only receive what she was entitled to on the date of judgment of  And this court ruled in that case that the court could have reduced the benefits to a present value and offset the money or property to wife. They could have allocated him to pay a portion of the benefits, or they could have used the reserve method approach and found that that approach was useful when the benefits could be calculated with certainty at the time of the judgment of dissolution. The appellant himself argued that he could not have retired in five years. That's when the parties divorced, five years after he was in the military. My client went from 50% of that retirement to 9% of that retirement, and I think when Justice Shuler asked the question, I would say yes. I think that was agreed to in the judgment of dissolution. It absolutely was agreed to. And then 9%, that percentage, was supposed to be on his retired pay. This court also in Corker quoted Whiting when the husband appealed because the trial court required him to pay half the value of his pension within 30 days to the wife rather than using the reserve jurisdictional approach. The court remanded that case and said, we think that the reserve jurisdictional approach was more reasonable because they did not know at the time what his retirement would be. And after five years in the military, of course, he did not know what his retirement was going to be. I don't have anything further unless you have questions. Questions? All right. Thank you. Thank you. Mr. Garga. Thank you, Your Honor. Nobody disputes the fact that using the reserve jurisdiction approach is the proper approach. Nobody disputes the 9%. As being the proper percentage. The only dispute is what that dollar amount amounted to and whether that was a stipulation that the parties agreed to. I quoted the language out of the West case to address stipulations. And it says, a stipulation is an agreement, and the court will look to the actual intent of the parties. Like a contract, it must be clear, certain, and definite in its material terms. If there was intended to be a stipulation to the exact dollar amount that was being determined to be pension, retired pay, whatever terms that was used in the judgment of dissolution, it was not spelled out. The court did not make findings to what the intent of the parties were, and there was no stipulation between the parties, this is the dollar amount that we're going to use based on his military retirement account statements that we have in front of us. None of that was done in this case. And it could have easily been done if that's what was intended. As a result, the judge in the February of 2021 hearing, the judge summarily says, and that's why I quoted the language that he says in there, let me jump in here. That's what he says. And then he says, I'm just going to make a finding that is gross. It's based on everything that he receives. He didn't say gross, but that's what he did. He used the gross retired military retainer pay, not disposable military retired retainer pay, like the USFSPA allows state courts to divide, because that's the only thing that the USFSPA allows state courts to divide. Not deductions associated with what a captain would make with five years, but not also what a lieutenant colonel or a colonel might make. Because like the court indicated a moment ago, it could be expected that he's going to get promotions. And they could have put that language in the judgment of dissolution, but that's not in there either. It doesn't state that she's entitled to a percentage based on the gross. It doesn't state that she's entitled to post-divorce longevity pay increases or post-divorce promotions. So, you know, it doesn't state either way. That's why a stipulation, and in particular in this case, a stipulation requires that the court clearly state what the intent of the parties is in the stipulation. And there's nothing like that in here. The judge just summarily concludes, well, I ruled that way initially. I didn't hear he didn't hear a whole lot of evidence before ruling. In fact, he cut the husband off with respect to that. And that must be what the parties agreed to. I'm going to find it to be a stipulation. And that was the end of that. On the survivor benefit plan, I want to say a couple of things about that. The SBP was stated that, and I don't want to overburden this point, but the SBP was supposed to be done by the wife. She was supposed to fill out whatever paperwork was necessary. That was the language that was encompassed within the judgment of disillusion. She was supposed to send in whatever forms, and all he was required to do under the terms is to cooperate and to sign any and all forms if required. Well, one thing is clear, neither party knew what they were supposed to do to cause this SBP to go into effect in 1996 when they got divorced. Because neither one of them accomplished getting whatever was necessary done. And yet the husband is found to be in contempt because the wife didn't submit the deemed election form. This is all borne out in the testimony of the expert witness, Mark Sullivan. But the husband is found in contempt, and he's supposed to buy life insurance. And the problem is Survivor Benefit Plan is not life insurance. And this testimony was brought out in the course of this, too, by the expert. This is, life insurance is a set dollar amount that she's guaranteed. Survivor Benefit Plan is only monthly payments that she would have received between the time of his death and the time of her death. And it's not going to, the calculation is completely different. It's pre-tax dollars versus post-tax dollars because Survivor Benefit Plan payments are taken out of military retired pay before that money is taxable, et cetera, et cetera. There's a lot of differences with respect to the two. But with regard to the SBP, is it fair that the husband has to pay, has to provide life insurance as a penalty instead of the wife splitting the cost or them doing something in between? You know, none of that was addressed. The judge just summarily ruled. Thank you. Thank you. We appreciate your arguments today. We'll take those into consideration along with the arguments you made in your briefs. We'll take the matter under advisement and issue a decision in due course.